1
2
3
4
5
6        **IN THE UNITED STATES DISTRICT COURT**
7        **FOR THE EASTERN DISTRICT OF CALIFORNIA**
8

9    KATHRYN POTTER,                    )    Case No. 2:08-cv-01174-MSB
                                        )
10              Petitioner,             )    **ORDER**
                                        )
11   vs.                                )
                                        )
12   TINA HORNBEAK, Warden,             )
     Valley State Prison for Women,     )
13                                      )
                Respondent.             )
14   _____)

15          Petitioner Kathryn Potter, a state prisoner incarcerated at Valley State

16   Prison for Women, seeks a writ of habeas corpus under 28 U.S.C. § 2254.  She

17   contends that her federal rights to due process and to present a defense were

18   violated by her conviction for felony child abuse and second-degree murder in

19   Sacramento County Superior Court, California.  (Dkt. #1).  For the reasons

20   discussed below, the petition is **DENIED**.

21   **I.  STATEMENT OF THE CASE**

22          Potter was tried and convicted by a jury for the second-degree murder of

23   Christopher Cejas, the twelve-year-old biological child of Potter's putative

24   husband, Andrew Cejas.  Potter was also found guilty of felony child abuse

25   toward Christopher, Cal. Pen. Code § 273a(a), and eligible for a sentencing

26   enhancement based on injury or harm resulting in death, *id.* § 12022.95.  (4 CT

1   945–47).[1]  The trial court sentenced her to a term of fifteen years to life in prison.

2   (4 CT 1041–44).

3       Potter challenged her conviction on appeal to the California Court of

4   Appeal for the Third District.  In an unpublished opinion, that court affirmed the

5   petitioner's conviction on all grounds.  *People v. Potter*, Nos. C052634,

6   CO53349, 2007 WL 4305547 (Cal. Ct. App. Dec. 10, 2007).   Petitioner filed a

7   Petition for Rehearing, denied without comment, and a petition for review with

8   the California Supreme Court, denied without comment on March 19, 2008.

9       Petitioner then filed a petition for writ of habeas corpus in the U.S.

10  District Court for the Eastern District of California on May 28, 2008.  (Dkt. #1).

11  Magistrate Judge Kimberly J. Mueller ordered the respondent to file a response to

12  petitioner's application.  (Dkt. #5).  Respondent answered the petition and filed

13  the state court record with this court.  (Dkt. # 8, 10, 18).  Petitioner filed a

14  traverse.  (Dkt. #13).  This case was then reassigned to Circuit Judge Marsha S.

15  Berzon for all further proceedings.  (Dkt. #19).

16  **II.  FACTUAL BACKGROUND**

17      The California Court of Appeal summarized the facts underlying the

18  criminal convictions of Potter (and Cejas, with whom Potter was tried) as follows:

19          Potter and Cejas lived together in Sacramento with their son,
20      P., and Potter's twin daughters. Potter thought she was Cejas's wife,
        as she did not know he was married when she and Cejas had a
        wedding ceremony. Christopher[, Cejas's biological son,] had been
21      raised by his mother's family and lived in North Carolina. In 2002
        Christopher went to Lancaster, California, to visit his grandparents
22      and Cejas met him there. Eventually, Christopher, age 12, came to
        live with [Potter and Cejas] in Sacramento.
23
24          Christopher was abused and starved. He was handcuffed and
        forced to stand for long periods, and was videotaped to ensure his
        compliance with discipline. During the five months he lived in
25      Sacramento his weight dropped from 137 to 103 pounds. Eventually,
        on the night of August 20-21, 2002, over a long period of time, he
26      was beaten so badly that his brain was bruised, his liver was torn, his

27      _____

28      [1] "CT" refers to the Clerk's Transcript in the record on appeal to the California Court of
    Appeal for the Third District.  "RT" refers to the Reporter's Transcript in that record.

broken ribs punctured his lung, which in turn displaced his heart, and he was kicked so hard in the groin that the area swelled, obscuring his genitals. Neither [Potter nor Cejas] sought help for Christopher.

The next morning Cejas left to join his work crew as part of his sentence on a charge of failing to register as a sex offender. Potter called her father, a retired law enforcement officer who lived in Oregon, and arranged to meet him in Redding[, California]. She did not tell anyone what had happened until she reached Redding. When Redding officers learned what happened and asked Sacramento officers to investigate, they found Christopher dead, from multiple, massive, blunt force injuries.

Cejas's defense was that Potter was the killer.

Potter's defense was that she had suffered years of abuse from Cejas and was unable to oppose his will or seek help for Christopher, raising theories of duress, battered woman's syndrome (BWS) and posttraumatic stress disorder (PTSD). The People rebutted these claims by evidence largely but not entirely from Potter's statements to the police, her testimony, and her diary entries and letters that although she had been molested as a child, she married a child molester; despite her claims of abuse by Cejas, she liked sex with him and stayed with him; she used a false last name on P.'s birth certificate to hide Cejas's status as a sex offender; she lied to Christopher's mother about Cejas's status; she misled a social worker investigating a possible molestation of one of Potter's daughters; she lied about having a fatal illness to get sympathy; she herself was abusive; and she actively hated Christopher because he was obese and because she knew Cejas still had feelings for Christopher's mother. She participated in withholding food and water from Christopher and at times handcuffed him herself. When her father came to pick up the twins the day before the fatal beating began, Christopher was handcuffed in another room and Cejas was out of the apartment, yet Potter said nothing to him. In short, she did nothing to stop the beatings because she did not like Christopher and did not want to get Cejas in trouble, not because she was afraid to act.

*Potter*, 2007 WL 4305547, at *1–*2.[2]

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), *as codified at* 28 U.S.C. § 2254, applies to Potter's petition.  *See Delgado v. Lewis*, 223 F.3d 976, 979 (9th Cir. 2000).  Under AEDPA, this court may "entertain [the] application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that [s]he is in custody in

---

[2] Potter's habeas petition in this court does not challenge her joint trial with Andrew Cejas.

1   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §

2   2254(a).  The application may not be "granted with respect to any claim that was

3   adjudicated on the merits in State court proceedings unless the adjudication of the

4   claim . . . resulted in a decision that was contrary to, or involved an unreasonable

5   application of, clearly established Federal law, as determined by the Supreme

6   Court of the United States; or resulted in a decision that was based on an

7   unreasonable determination of the facts in light of the evidence presented in the

8   State court proceeding."  *Id.* § 2254(d).

9     "[C]learly established federal law" under 28 U.S.C. § 2254(d) "refers to

10  the holdings, as opposed to the dicta, of th[e] [Supreme] Court's decisions as of

11  the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362,

12  412 (2000); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  "Under the

13  'unreasonable application' clause, a federal habeas court may grant the writ if the

14  state court identifies the correct governing legal principle from [the Supreme]

15  Court's decisions but unreasonably applies that principle to the facts of the

16  prisoner's case."  *Williams*, 529 U.S. at 413.  "[A] federal habeas court making

17  the 'unreasonable application' inquiry should ask whether the state court's

18  application of clearly established federal law was *objectively* unreasonable," not

19  whether it was "erroneous."  *Id.* at 409–10 (emphasis added).

20  **IV.  DISCUSSION**

21    Potter argues that her rights under the federal Due Process Clause of the

22  Fourteenth Amendment and Sixth Amendment were violated by her conviction.

23  She urges six grounds on which to grant her habeas petition.  Four of these

24  grounds arise from alleged instructional errors; the other two focus on the

25  sufficiency of the evidence to support Potter's conviction.  The State initially

26  conceded that Potter has exhausted all her claims, (Dkt. #8 at 2), but, at oral

27  argument, it clarified that it believed Potter has either failed to exhaust or, in the

28  alternative, procedurally defaulted any federal constitutional claim predicated on

1   whether an omission can constitute the actus reus of implied malice murder under

2   California law, if the court determines Potter has raised such a claim.

3       Before setting forth Potter's arguments, the court provides some necessary

4   background.  The State alleged that the felony child abuse occurred between

5   August 18 and 21, 2002, and that the murder occurred on August 20 and 21, 2002.

6   (1 CT 47–48).  The jury in Potter's case was instructed on, *inter alia*, multiple

7   theories of second-degree murder and felony child abuse or endangerment.  One

8   theory was contained in Instruction 8.31 of the California Jury Instructions,

9   Criminal (CALJIC), on implied malice murder, by which Potter could be

10  convicted if she was a perpetrator of the murder.  Adding to CALJIC 8.31, the

11  trial court instructed the jury that, to find Potter guilty of implied malice murder,

12  the "intentional act" necessary to the crime could include "an omission or failure

13  to act in those situations where a person is under a legal duty to act," and that

14  "[a]ny person having care and custody of a minor child has a duty to obtain

15  medical treatment when[] failure to do so, could endanger the health of the child."

16  (3 CT 880).[3]  The jury was also instructed that Potter could be convicted of

---

[3]  The full instruction provided:

> Murder of the second degree is . . . the unlawful killing of a human being when:
> 1. The killing resulted from an intentional act,
> 2. The natural consequences of the act are dangerous to human life, and
> 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.
>     When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being.
>     The word "act" as used in these instructions includes an omission or failure to act in those situations where a person is under a legal duty to act.
>     Any person having care and custody of a minor child has a duty to obtain medical treatment when, failure to do so, could endanger the health of the child.

(3 CT 880).

second-degree murder if she aided and abetted Cejas's commission of felony

child abuse and murder was the "natural and probable consequence" of that

abuse.[4]  In addition, the jury received instructions on Potter's defenses of duress,

battered woman's syndrome, and posttraumatic stress disorder.

During deliberations, the jury asked the trial court nine questions, of

which several were pertinent to Potter's claims on habeas.  Of those, the first was

the jury's request for a definition of "care and custody," the term used in the

court's instructions on implied malice murder.  The trial court responded that this

term "'d[id] not imply a familial relationship but only a willingness to assume

duties correspondent to the role of a caregiver.'"  (4 CT 915 (quoting *People v.*

*Culuko*, 78 Cal. App. 4th 307, 335 (Cal. Ct. App. 2000))).  The jury then asked

whether it should consider Potter's state of mind in the child abuse charge.  (4 CT

---

[4]  The instruction, CALJIC 3.02, provided:

One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted.

In order to find the defendant guilty of the crime of murder based upon aiding and abetting, you must be satisfied beyond a reasonable doubt that:

1. The crime of felony child abuse was committed;

2. That the defendant aided and abetted the crime of felony child abuse,

3. A co-principal in the crime of felony child abuse committed the crime of murder, and,

4. The crime of murder was a natural and probable consequence of the commission of the crime of felony child abuse.

In determining whether a consequence is "natural and probable," you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur.  The issue is to be decided in light of all of the circumstances surrounding the incident.  A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened.  "Probable" means likely to happen.

(3 CT 864).

1    916).  The court told the jury that "[t]here is no specific intent or mental state"

2    required for the child abuse charge.  (4 CT 917).

3         The jury's next pertinent question came in two parts:  It asked, first,

4    whether the term "act" as used in CALJIC 3.00, which defines "principals" to a

5    crime (both those directly committing the crime and aiders and abettors), included

6    an "omission or failure to act" as listed under the implied malice murder

7    definition.  The court replied: "No.  In CALJIC 3.00 and 3.01[, which defines

8    aider and abettor liability], the term 'act' does not include an omission or failure

9    to act.  Aider and abettor liability for murder cannot be based on an omission or

10   failure to act."  (4 CT 941).

11        In a separate part of that question, the jury focused on the term "act" as

12   used in the definition of implied malice, which requires that "[t]he killing resulted

13   from an intentional act."  The jury asked if "act" included an omission or failure

14   to act as discussed in the implied malice murder instruction.  The court responded

15   that "[t]he answer depends on what you find the facts to be."  (4 CT 941).  It

16   noted that the term "act," as used in the implied malice definition and the implied

17   malice murder instruction, included an omission or failure to act where an

18   individual has a duty to do so.  The court noted, however, that "aider and abettor

19   liability for murder cannot be based on an omission or failure to act," instructing

20   that "[a]s a principal, one may be liable for implied malice murder based upon a

21   failure to act where a legal duty to act exists, . . . as long as you are satisfied

22   beyond a reasonable doubt that all other elements have been established."  (4 CT

23   941).  Less than two hours after this response was given (along with responses to

24   two other questions about Potter's state of mind), the jury announced it had

25   reached a verdict.  (4 CT 935–36).  In general verdicts, the jury found Potter

26   guilty of the crimes of second-degree murder and felony child abuse but acquitted

27   her of first-degree murder.  (4 CT 945–47).

28

1    Potter now makes six arguments with regard to her murder conviction:[5]

2    (1) that she was denied due process by the court's instructions permitting a

3    murder conviction based on aider and abettor liability without evidence of an

4    "intentional act or advice which aided, promoted, encouraged, or instigated the

5    commission of the target crime [of felony child abuse] or the murder itself";  (2)

6    that she was denied due process "because the state trial court incorrectly

7    instructed the jury that for murder liability, an implied malice murder committed

8    by the co-defendant need only have been a reasonably foreseeable consequence,

9    as opposed to a natural and probable consequence, of petitioner's failure to call

10   police"; (3) that she "was denied a defense to the charge of felony child abuse,

11   and thus to the charge of murder as a natural and probable consequence, when the

12   trial court failed to instruct *sua sponte* on the defense of necessity"; (4) that by

13   instructing the jury that it could convict Potter of implied malice murder on the

14   basis of a failure to act, the trial judge improperly relieved the prosecution of the

15   burden of proof as to one element of that offense; (5) that she was denied due

16   process because of insufficient evidence to support her conviction as a perpetrator

17   of implied malice murder, or to conclude that the jury convicted her on this

18   theory; and (6) that she was denied due process because there was insufficient

19   evidence that murder was a natural and probable consequence of the felony child

20   abuse, based on the information Potter had available to her before Christopher's

21   death.  (Dkt. #1 at 4–5).

22   Because the California Supreme Court denied without comment Potter's

23   petition for review, this court considers the unpublished opinion by the California

24   Court of Appeals as the basis for its decision.  *See Ylst v. Nunnemaker*, 501 U.S.

25   797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 & n.3 (9th Cir.

26   2005).

27   _____

28   [5]  Potter did not challenge on appeal in the state court or in her federal habeas petition the felony child abuse conviction.  *See* Dkt. #1 at 46.

**A.  Instructional Errors**

**1.  "Act or Advice" in Aider and Abettor Instruction**

Potter first argues that the trial court's instructions on aider and abettor liability permitted her conviction for murder without evidence of an intentional act or advice that aided, promoted, encouraged, or instigated the commission of the target crime of felony child abuse, and that such ambiguity in the instruction improperly relieved the state of its burden to prove every fact necessary to her conviction.  The target offense of felony child abuse or endangerment requires either general criminal intent, if the pain or suffering is directly inflicted, or criminal negligence, if the abuse or endangerment is indirect.  *People v. Valdez*, 27 Cal. 4th 778, 789–90 (Cal. 2002).  Felony child abuse can be triggered by a failure to act or an omission.  *Id.*  Therefore, Potter argues, the jury could have found her guilty of felony child abuse as an aider and abettor, and then guilty of murder as a natural and probable consequence of such abuse, without any affirmative act on Potter's part.[6]

"[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief."  *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991).  Instead, when reviewing alleged due process violations arising from instructional errors, a habeas court must ask "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

---

[6] The court notes that California courts are divided as to whether aider and abettor liability for murder can be based on a failure to act.  *See People v. Culuko*, 78 Cal. App. 4th 307, 331 n.7 (Cal. Ct. App. 2000) (noting the split in authority); *see also People v. Rolon*, 160 Cal. App. 4th 1206, 1212-1219 (Cal. Ct. App. 2008) (discussing this issue at length and concluding an omission can suffice where there is a legal duty to act).  Because the California state courts accepted the premise that an omission was not sufficient for aider and abettor murder liability for purposes of Potter's case, I therefore do so as well.

1    charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A jury instruction that "ha[s]

2    the effect of relieving the state of th[is] burden of proof" is constitutionally

3    defective. *Sandstrom v. Montana*, 442 U.S. 510, 521 (1979).  Likewise, a

4    defendant's due process rights are violated when "there is a reasonable likelihood

5    that the jury has applied the challenged instruction in a way that prevents the

6    consideration of constitutionally relevant evidence." *Boyde v. California*, 494

7    U.S. 370, 380 (1990).  In conducting this due process inquiry, a state court must

8    "presume[] [that a jury will] follow its instructions" and "understand a judge's

9    answer to its question." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

10        The trial court properly instructed the jury on the elements of aider and

11   abettor liability under California law.  This conclusion follows from consideration

12   of *People v. Culuko*, 78 Cal. App. 4th 307 (Cal. Ct. App. 2000).  *Culuko*

13   considered a challenge to jury instructions, much like those here, permitting aider

14   and abettor liability as applied to a felony child abuse offense resulting in murder.

15   *Id.* at 330.  The defendants argued that aider and abettor liability could not apply

16   to the target offense of felony child abuse, as criminal liability for that crime

17   could be triggered by an omission, whereas aider and abettor liability required an

18   affirmative act, not just a failure to act.  *See id.*  The state appellate court,

19   disagreeing, upheld the defendants' convictions for both felony child abuse and

20   murder because the jury was instructed that for aider and abettor liability, it had to

21   find that the defendant "by act or advice" aided and abetted child abuse, and that

22   to find the defendant guilty of murder as a "natural and probable consequence" of

23   the abuse, it had to find that the defendant aided and abetted the felony child

24   abuse. *Id.*  In other words, the instructions given in *Culuko* conformed with what

25   *Culuko* assumed California aider and abettor law requires, by eliminating the

26   failure-to-act version of felony child abuse as the predicate for aider and abettor

27   liability for murder.

28

1    Likewise, Potter's jury was instructed using CALJIC 3.01, which sets

2  forth the elements of aider and abettor liability under California law.  It was told

3  that Potter must, "by act or advice aid[], promote[], encourage[] or instigate[] the

4  commission of the crime."  (3 CT 863).  The jury instruction also explicitly stated

5  that "[m]ere knowledge that a crime is being committed and the failure to prevent

6  it does not amount to aiding and abetting."  *Id.*  Moreover, as the state appellate

7  court noted, the trial court specifically instructed the jury in response to a

8  question during deliberations that the jury could not find Potter guilty of second-

9  degree murder under aider and abettor liability based on her "omission or failure

10  to act."  (4 CT 941).

11    Given these clarifying admonitions in the instructions and the responses to

12  the jury's questions, the state appellate court's application of *Weeks*, *Boyde*,

13  *Sandstrom*, and *Estelle* to this case was not unreasonable.  Potter's petition must

14  be denied as to this ground.

15         **2.  Use of "Reasonably Foreseeable" Consequence Standard**

16    Potter next argues that the trial court erred in its instruction on aider and

17  abettor liability by requiring only that murder be a "reasonably foreseeable"

18  consequence of the felony child abuse, not a "natural and probable" consequence.

19    As with Potter's first claim, the trial court did not err in its instructions

20  under California law, so there was no due process violation.  The state trial court

21  instructed the jury using CALJIC 3.02, which provides that murder must be "a

22  natural and probable consequence of the commission of the crime of felony child

23  abuse."  (3 CT 864).  That instruction defined "probable" as "likely to happen"

24  and a "natural" consequence as "one which is within the normal range of

25  outcomes that may be reasonably expected to occur if nothing unusual has

26  intervened."  *Id.*  The state court also added a customized instruction, in which it

27  stated that, to determine whether murder was a natural and probable consequence,

28  the jury "must determine whether a reasonable person in the defendant's position

1    would have known that the crime was a reasonably for[e]seeable consequence of

2    the act aided and abetted." (3 CT 865).  The instructions went on to inform the

3    jury that "if you find, beyond a reasonable doubt that Potter did aid and abet

4    Cejas'[s] commission of felony child abuse, and it was for[e]seeable that Cejas

5    would commit murder as a result, you may find Kathryn Potter guilty of murder

6    under this theory of aiding and abetting." *Id.*

7        These instructions were consistent with California law, which deems a

8    "natural and probable consequence" and a "foreseeable consequence" as

9    "equivalent in both legal and common usage" for purposes of aider and abettor

10   liability. *People v. Coffman*, 34 Cal. 4th 1, 107 (Cal. 2004). "[T]he natural and

11   probable consequences doctrine limits liability to those offenses that are

12   reasonably foreseeable consequences of the act originally aided and abetted." *Id.*

13   at 108.  The trial court so instructed the jury.  The state appellate court reasonably

14   applied *Weeks*, *Boyde*, and *Estelle* in concluding that the jury instruction did not

15   violate Potter's right to due process.  Potter's petition must be denied on this

16   ground.

17                    **3.  Necessity Defense**

18       Potter also claims that the state court erred by failing to instruct *sua sponte*

19   on the defense of necessity, which would have applied to the target offense of

20   felony child abuse, and by extension, murder as the natural and probable

21   consequence of the abuse.  A defendant has a right to a "meaningful opportunity

22   to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485

23   (1984).  He is entitled to a jury instruction for "any recognized defense for which

24   there exists evidence sufficient for a reasonable jury to find in his favor."

25   *Mathews v. United States*, 485 U.S. 58, 63 (1988); *see also Bradley v. Duncan*,

26   315 F.3d 1091, 1098–99 (9th Cir. 2002).  Under *Henderson v. Kibbe*, a state

27   court's instructional "omission, or an incomplete instruction[,]" requires a grant

28

1  of the writ only if it "'so infected the entire trial that the resulting conviction

2  violates due process.'"  431 U.S. 145, 154–55 (quoting *Cupp*, 414 U.S. at 147).

3       The California Court of Appeal concluded that substantial evidence did

4  not support two elements of the defense of necessity, so an instruction on that

5  theory was unwarranted.  Moreover, it reasoned that the jury ultimately found

6  Potter guilty of felony child abuse, and so necessarily rejected her defense of

7  duress and the evidence on battered woman's syndrome; as the same factual

8  predicates rejected with regard to the duress and battered women's syndrome

9  defenses were essential to a necessity defense, the failure to instruct on the

10  defense of necessity did not prejudice Potter.  *Potter*, 2007 WL 4305547, at

11  *12–*13.

12       This court need not consider whether the state appellate court erred in

13  concluding that a necessity instruction was not warranted.  As the California

14  Court of Appeal discussed, the jury must have found that the "evidence raised no

15  doubt as to duress and [battered woman's syndrome,]" and so would not have

16  been persuaded of a necessity defense, which Potter had the burden to show by a

17  preponderance of the evidence under California law.  *Id.* at *13. There was no

18  evidence before the jury that Cejas had abused his infant son, much less

19  endangered his life.  Potter herself stated in an interview the day after the beating

20  that she "didn't know who to save," but that she "knew that [her son] probably

21  wouldn't get hurt on purpose."  (2 CT 504; *see also* 2 CT 373).  So a necessity

22  defense, like a duress defense, could only have been premised on danger to Potter,

23  not to her son.

24       The jury was instructed that a duress defense would preclude a felony

25  child abuse conviction "[w]here the threats and menaces [we]re such that they

26  would cause a reasonable person to fear that her life would be in immediate

27  danger if she did not engage in the conduct charged, and . . . [Potter] then actually

28  believed that her life was so endangered."  (3 CT 872).  A jury that rejected these

factual predicates as part of a duress defense would not conclude, as required for

a necessity defense, that Potter had a "'good-faith belief that [engaging in felony

child abuse] was necessary to prevent [a] greater harm.'" *Potter*, 2007 WL

4305547, at *12 (quoting CALJIC 4.43); *see also People v. Pepper*, 41 Cal. App.

4th 1029, 1035 (Cal. Ct. App. 1996).  Moreover, that same jury would not have

concluded that such "'belief was objectively reasonable,'" another required

element of a necessity defense.  *Potter*, 2007 WL 4305547, at *12 (quoting

CALJIC 4.43); *see also Pepper*, 41 Cal. App. 4th at 1035.

Thus, even assuming that the state trial court should have given an

instruction on necessity, the state appellate court's application of *Henderson*'s

prejudice requirement to Potter's case was not unreasonable.  The writ must be

denied on this ground.

### 4. Implied Malice Murder by Omission

As already noted, less than two hours before the jury returned a verdict,

the trial judge responded to a question from the jurors by instructing that, "[a]s a

principal, one may be liable for implied malice murder based upon a failure to act

where a legal duty to act exists." (4 CT 935).  Potter now points to *People v.*

*Whisenhunt*, 44 Cal. 4th 174 (Cal. 2008), a California Supreme Court decision

published after Potter's conviction, which casts some doubt on whether an

omission where there is a legal duty to act can constitute an "intentional act" for

purposes of  implied malice murder.[7]  Construed in the most charitable light,[8]

Potter's argument is that, by instructing the jury that it did not need to find an

---

[7] Potter does not contest the part of the implied malice instruction that stated "*[a]ny* person having care and custody of a minor child has a duty to obtain medical treatment when failure to do so would endanger the health of the child." (3 CT 880) (emphasis added). Nor does she contend that there is insufficient evidence that she did not have "care and custody" of Christopher or that the trial court's supplemental instruction on the meaning of that term was incorrect.

[8] *Whisenhunt* was mentioned only in a footnote in Potter's Traverse, in a section devoted to the sufficiency of the evidence for implied malice murder.

1    overt intentional act to convict for implied malice murder, the trial court

2    unconstitutionally "reliev[ed] the state of the burden of proof," *Sandstrom*, 442

3    U.S. at 521, as to one element of the offense of implied malice murder.  A basis

4    for habeas relief would exist if "there is a reasonable likelihood that the jury has

5    applied the challenged instruction in a way that violates the constitution." *Estelle*,

6    502 U.S. at 72 (quotation omitted).  Here, the Court of Appeal concluded that "it

7    seems clear that Potter's jury predicated liability on implied malice murder,"

8    *Potter*, 2007 WL 4305547 at *7, so any such unconstitutional application of the

9    challenged instruction would likely be prejudicial.  *See Brecht v. Abrahamson*,

10   507 U.S. 619, 636-38 (1993).

11       In response, the state counters (1) that this court, as a federal habeas court,

12   must accept the California Court of Appeal's interpretation of state law as

13   conclusive of whether an omission may count as an "intentional act" for purposes

14   of implied malice murder; (2) that under California law, an omission can

15   constitute an intentional act for purposes of implied malice murder, and

16   *Whisenhunt* did not hold otherwise; and (3) that, whatever its merits, Potter has

17   failed to exhaust state remedies and procedurally defaulted on any argument

18   based on *Whisenhunt*.  The court need not consider whether the first or third of

19   these contentions is persuasive, as the second is: where a legal duty to act exists,

20   an omission can constitute an act for purposes of California implied malice

21   murder.

22       **a. The Basis for Federal Habeas Relief**

23       As discussed, "the Due Process Clause protects the accused against

24   conviction except upon proof beyond a reasonable doubt of every fact necessary

25   to constitute the crime with which he is charged." *Winship*, 397 U.S. at 364.  A

26   jury instruction that "ha[s] the effect of relieving the state of th[is] burden of

27   proof" is constitutionally defective.  *Sandstrom*, 442 U.S. at 521 (1979).   In

28   conducting this due process inquiry, we must presume that a jury will "follow its

-15-

1   instructions" and "understand a judge's answer to its question." *Weeks*, 528 at

2   234.

3         Thus, if the offense of implied malice murder under California law

4   required the existence of an intentional act, the Due Process Clause, as construed

5   by *In re Winship* and *Virginia v. Jackson*, would require the prosecution to prove

6   that element of the offense beyond a reasonable doubt.  If an omission, under

7   California law, did not count as an act for purposes of implied malice murder,

8   then the trial judge's instruction would have "had the effect of relieving the state

9   of the burden of proof" as to one element of the offense in violation of the federal

10  Due Process Clause. *Sandstrom*, 442 U.S. at 521.

11                **b. The "Intentional Act" of Implied Malice Murder**

12        In *Whisenhunt*, a capital case published two-and-a-half years after Potter's

13  conviction, Whisenhunt argued that a second-degree murder instruction should

14  have been given because the jury could have found him guilty of failing to

15  provide medical care for his girlfriend's child even if it did not believe that he

16  killed the child.  Addressing this argument, the California Supreme Court stated,

17  first, that the "defendant provide[d] no authority that a failure to act can, on its

18  own, constitute an 'intentional act' for implied malice murder." *Whisenhunt*, 44

19  Cal. 4th at 217.  If this statement were a holding as to the elements of implied

20  malice murder under California law, Potter might be able to claim that the trial

21  court's instruction that an omission can constitute an act for purposes of implied

22  malice murder had the effect of relieving the state of the burden of proof as to one

23  element of the offense.  But a much more plausible reading of this statement in

24  passing in *Whisenhunt* is that it was a procedural determination regarding the

25  adequacy of briefing in that case, not a substantive interpretation of California

26  law.

27        Shortly before *Whisenhunt,* California's Second District Court of Appeal

28  expressly held, in a carefully reasoned decision citing several authorities on

                                              -16-

1    point—including *People v. Burden*, 72 Cal. App. 3d 603 (Cal. Ct. App. 1977) and

2    1 LaFave, Substantive Criminal Law (2d ed.2003) § 6.2(a)(1)—that "a

3    parent's failure to fulfill his or her common law duty to protect his or her child

4    from attack . . . can support liability for implied malice murder." *People v. Rolon*,

5    160 Cal. App. 4th 1206, 1219 (Cal. Ct. App. 2008).  So there certainly *was*

6    authority for this proposition at the time *Whisenhunt* was decided.  The court

7    finds it quite unlikely that the members of the California Supreme Court and their

8    staffs have such poor research skills as not to find *Burden* and *Rolon* squarely

9    holding that a failure to act where there is a duty to act can support second degree

10   implied malice murder—or the leading criminal law treatise, so stating.  Instead,

11   the California Supreme Court must have meant simply what it said: that is, "the

12   defendant provide[d] no authority" showing that an omission can constitute an

13   act, so the justices declined to consider the defendant's argument premised on that

14   theory.

15        Further, in at least some circumstances—the facts of *Burden*, for

16   example, where a father did not assure that an infant was fed, even though he

17   knew she was thin and sickly—the court finds it unlikely that the California

18   Supreme Court, if it considered the issue after adequate briefing, would

19   disapprove of the principle that failures to act where there is a duty to do so can

20   support a conviction for second-degree implied malice murder.  Finally,

21   *Whisenhunt* rejected the lesser-included-offense contention for other, well-

22   articulated reasons, aside from the opinion's comment on whether an omission is

23   sufficient to constitute an act for purposes of implied malice murder.  So the

24   California Supreme Court had no reason to, and did not, delve into that rather

25   difficult legal issue beyond its comments on the state of the briefing and some

26   related observations.

27        These circumstances, taken together, satisfy me that *Whisenhunt* did not in

28   fact disapprove the principle that an omission can constitute an act where there is

1   a legal duty to act.  Rather, *Whisenhunt* declined to decide the issue in the face of

2   inadequate briefing and the presence of other reasons it thought sufficient to reject

3   the contention of the defendant in that case that a second-degree murder

4   instruction should have been given.

5        This conclusion forecloses Potter's challenge to the implied malice murder

6   instruction premised on *Whisenhunt*.  The court notes, in addition, that if the issue

7   had to be addressed, it would likely agree with the State's contention at oral

8   argument that Potter had failed to exhaust or, in the alternative, had procedurally

9   defaulted any federal constitutional objection predicated on whether an omission

10  could serve as an act for purposes of implied malice murder under California law.

11  At trial and in briefing to the California Court of Appeal, Potter did not challenge

12  the trial judge's instruction that an omission can constitute an intentional act.  *See*

13  *Potter*, 2007 WL 4305547 at *6-*7.  The Court of Appeal expressly observed that

14  Potter did not "develop[] any argument why th[e implied malice] theory of

15  liability is not supported by the evidence or is otherwise infirm, [and so it]

16  deem[ed] any such arguments to be forfeited."  *Id.* at *7.  It also noted this

17  instruction "correctly stated the law applicable to implied malice murder."  *Id.* at

18  *6.

19       Potter's federal constitutional challenge to the trial court instruction is

20  entirely predicated on an alleged error of state law.  Because the California Court

21  of Appeal expressly held that it would not consider the state law issue because of

22  Potter's failure to brief it, Potter would have great difficulty satisfying the

23  exhaustion requirement.  S*ee* 28 U.S.C. § 2254(b)(1); *Castillo v. McFadden*, 399

24  F.3d 993, 999 (9th Cir. 2005); *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir.

25  1996).  Even if she could satisfy the exhaustion requirement, she would almost

26  certainly have procedurally defaulted her claim.  *See Coleman v. Thompson*, 501

27  U.S. 722, 750 (1991) (explaining that when "a state prisoner has defaulted his

28

federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is [generally] barred").

## B. Sufficiency of the Evidence Claims

Potter's last two arguments focus on the sufficiency of the evidence to convict her of murder under two alternative theories: (1) implied malice murder and (2) murder as the natural and probable consequence of aiding and abetting Cejas's felony child abuse.  As noted, the California Court of Appeal concluded that she was most probably convicted under the first theory.  *Potter*, 2007 WL 4305547, at *7.  It observed that Potter "neither head[ed][9] nor develop[ed] any argument why *this* theory of liability is *not* supported by the evidence or is otherwise infirm" and so "deem[ed] any such arguments to be forfeited," but it then stated that this theory was, in fact, "factually supported."  *Id.*  As a result, the court reasoned, even if "no substantial evidence supported an aiding theory, [it] would affirm because [it] would not assume that the alleged error in submitting the factually unsupported aiding theory to the jury was prejudicial."  *Id.*  In the alternative, the state appellate court held that there was sufficient evidence to convict Potter of murder as an aider and abettor.[10]  *Id.* at *7–*9.

This court need not consider whether there was sufficient evidence to convict Potter of murder as an aider and abettor because there was unquestionably sufficient evidence to convict her under the implied malice theory.  A guilty verdict does not offend due process when a jury convicts a defendant of a crime for which alternative legal theories were asserted, so long as sufficient evidence

---

[9]  The term "head[ed]," as used by the California Court of Appeal, presumably refers to the arguments that Potter identified in headings in her state appellate briefing.

[10]  Potter argues that the state court had no basis to conclude that she was convicted as a direct perpetrator of implied malice murder, as the State did not rely on this theory during trial.  To the contrary, it is clear that the State pressed this theory, both in the jury instruction conference (11 RT 3073–74), and in the State's closing argument to the jury (11 RT 3162–63; 3217–19).

1   supported any one of the theories.  *See Griffin v. United States*, 502 U.S. 46,

2   56–58 (1991) (Fifth Amendment due process); *Turner v. United States*, 396 U.S.

3   398, 420 (1970) (same); *see also Sochor v. Florida*, 504 U.S. 527, 538 (1992)

4   (describing *Griffin* as holding that "it was no violation of due process that a trial

5   court instructed a jury on two different legal theories, one supported by the

6   evidence, the other not").  As a result, Potter's claims based on the sufficiency of

7   the evidence to convict her of second-degree murder must be denied.

8   **1.  Governing Law**

9       Under clearly established federal law, "the Due Process Clause protects

10  the accused against conviction except upon proof beyond a reasonable doubt of

11  every fact necessary to constitute the crime with which he is charged."  *Winship*,

12  397 U.S. at 364.  "[T]he relevant question is whether, after viewing the evidence

13  in the light most favorable to the prosecution, *any* rational trier of fact could have

14  found the essential elements of the crime beyond a reasonable doubt."  *Jackson v.*

15  *Virginia*, 443 U.S. 307, 319 (1979).

16      "After AEDPA, [this court] appl[ies] the standards of *Jackson* with an

17  additional layer of deference."  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir.

18  2005).  The court must now ask whether the state court decision "reflected an

19  'unreasonable application of' *Jackson* and *Winship* to the facts of this case."  *Id.*

20  at 1275 (quoting 28 U.S.C. § 2254(d)(1)).  "Although [the court's] sufficiency of

21  the evidence review is grounded in the Fourteenth Amendment, [it] undertake[s]

22  the inquiry with reference to the elements of the criminal offense as set forth by

23  state law."  *Id.* at 1275.

24  **2.  The Evidence**

25      The California Court of Appeal reasonably applied *Jackson* and *Winship*

26  to the facts of this case.  As it noted, the jury heard evidence "that Potter was

27  Cejas's putative wife, enrolled Christopher in school, arranged for his clothing,

28  prepared his meals–when he was allowed to eat–and so forth."  *Potter*, 2007 WL

1    4305547, at *5.  So the California Court of Appeal reasonably concluded that

2    there was sufficient evidence to show that Potter had "care and custody" of

3    Christopher and so was under a duty to obtain medical treatment for him.

4    　　　Moreover, there was ample evidence that Potter "*knew* Christopher was

5    subjected to great bodily injury for a long time" and that she did not "seek

6    medical help."  *Id.* at *8.  In addition to Potter's own statements that she was

7    present for the beating and did not call 911, Potter's upstairs neighbor testified

8    that she heard Cejas yelling at Christopher and hitting sounds around 11 pm on

9    the night of his death.  (2 RT 492–93).  She said that she heard Potter's voice

10   during that time, placing Potter at the scene of the crime, and that she did not

11   sound angry.  (*Id.* at 495–96).  Moreover, a doctor testified that Christopher died

12   of "multiple blunt force injuries," in other words, that he was beaten to death.  (3

13   RT 671).  The jury heard medical testimony that it would have taken hours to

14   amass these injuries (*id.* at 725), and that it could have taken hours for the injuries

15   to be lethal (*id.* at 672–73).  The prosecution also introduced evidence that had

16   there been medical intervention, there was a "good possibility" that Christopher

17   would have survived.  (*Id.* at 673).

18   　　　The state appellate court also reasonably concluded that there was

19   sufficient evidence for the jury to reject Potter's defenses of duress, battered

20   woman's syndrome, and posttraumatic stress disorder.  "In short," it reasoned,

21   "[Potter] did nothing to stop the beatings because she did not like Christopher and

22   did not want to get Cejas in trouble, not because she was afraid to act." *Potter*,

23   2007 WL 4305547, at *2.  The court emphasized that the jury heard evidence that

24   Potter "participated in withholding food and water from Christopher and at times

25   handcuffed him herself" and that she "hated Christopher because he was obese."

26   *Id.*  There is ample evidence to support this conclusion.  One of Potter's young

27   daughters testified that her mother  would sometimes handcuff Christopher so that

28   he could not get food or when Potter wanted to take naps.  (4 RT 918, 925,

972–73).  Other witnesses testified that they had seen Potter slap Christopher in the face (5 RT 1315), tell him that he was fat (*id.* at 1318), and force him to stand on hot concrete in the sun for thirty to forty-five minutes as punishment (*id.* at 1385–86).  Witnesses also described remarks Potter had made about Christopher in their presence, such as calling him a "fat fuck" (*id.* at 1479), and saying that she "hate[d]" him (*id.* at 1386).

Moreover, although the record includes a great deal of evidence that Cejas abused Potter, the record contains other evidence that Potter was willing to defy Cejas.  Potter's father testified that he had seen his daughter stand up to Cejas on occasion, and that at least once he had seen Potter lose her temper with Cejas and call him names.  (*Id.* at 1297).  A neighbor also testified that she heard Potter and Cejas arguing on various occasions, and that it seemed like "sometimes [Potter] might have been the one instigating it."  (2 RT 526).  A friend of Cejas's who lived with the family around the time that Christopher arrived testified that Potter was able to leave the house when she wanted (5 RT 1323), and that she would often go outside at night, including to the porch or parking lot (*id.* at 1340–41).  Potter herself testified to going outside to smoke a cigarette while the beating took place on the night of Christopher's death.  (2 CT 406, 456–57).  She also told investigators soon after Christopher's death that had Cejas beaten one of her daughters, she "would have taken them and left" and that she would have fled to save their lives.  (3 CT 753).

Other evidence suggested that Potter was not telling the truth or that her story was contrived.  A neighbor testified that the morning following Christopher's death, she heard Potter and Cejas outside in the parking lot talking calmly and that they started their cars to leave at the same time.  (2 RT 497–98).  This testimony conflicted with Potter's statement that she waited until after Cejas left the house the morning after the beating while fearing that Cejas would

1  return.[11]  (3 CT 698–700).  In addition, a friend of Potter's testified that after

2  Potter was arrested, the friend discovered a notebook in her car belonging to

3  Potter.  (5 RT 1429–30).  The notebook contained written "testimonies" to the

4  police (*id.* at 1429), some of which had been crossed out or switched around and

5  reflected different accounts of the night of the beating (*id.* at 1438).

6      Based on this evidence, the state court was not unreasonable in concluding

7  under *Jackson* and *Winship* that a rational trier of fact could have found all of the

8  elements for implied malice second-degree murder.  Because there was sufficient

9  evidence to convict Potter under this theory of the crime, the court need not

10  consider her argument that insufficient evidence supported an aider and abettor

11  theory of murder.

12

13

14      **Accordingly,**

15      **IT IS HEREBY ORDERED** that the petition for a writ of habeas corpus

(Dkt. #1) is denied.

16      **IT IS FURTHER ORDERED** that the Clerk of the Court shall enter

17  judgment accordingly.

18

19      DATED this 26th day of January, 2011

20

21

                                /s/ Marsha S. Berzon

22                              MARSHA S. BERZON
                                United States Circuit Judge, sitting by designation

23

24

25

26  [11] Potter contends that the jury was bound to credit her statements supporting a duress defense because Potter's other statements regarding the beating were used to establish her criminal

27  responsibility.  *See* Dkt. #1 at 48.  This argument is without merit.  The jury was not bound to accept Potter's testimony wholesale; rather, it was free to rely on other evidence, including the

28  prosecution's evidence undercutting Potter's defenses.  *See People v. Chapman*, 261 Cal. App. 2d 149, 177 (Cal. Ct. App. 1968).